RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0204p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

CECIL KOGER,

                              *Plaintiff-Appellant*,

      *v.*

GARY C. MOHR, et al.,

                              *Defendants-Appellees*.

No. 19-4020

─────────────

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:17-cv-02409—Benita Y. Pearson, District Judge.

Argued:  April 28, 2020

Decided and Filed:  July 7, 2020

Before:  CLAY, COOK, and WHITE, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ARGUED:**  Andrew Geronimo, CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW, Cleveland, Ohio, for Appellant.  Mindy Worly, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.  **ON BRIEF:**  Andrew Geronimo, CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW, Cleveland, Ohio, for Appellant. Mindy Worly, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.

─────────────

## OPINION

─────────────

      HELENE N. WHITE, Circuit Judge.  Cecil Koger is an inmate of the Ohio Department of Rehabilitation and Correction (ODRC) and a practicing Rastafarian.  Between 2006 and 2018,

Koger made numerous religious-practice accommodation requests, including requests to grow his dreadlocks, keep a religious diet, observe fasts, and commune with other Rastafarians. Alleging that ODRC's responses were inadequate, Koger brought these claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA) and 42 U.S.C. § 1983 against several ODRC officials. The district court granted summary judgment to Defendants. We affirm in part, reverse in part, and remand for further proceedings.

## I. Background

Koger has been incarcerated since 2000 at several facilities, including Trumbull Correctional Institute (TCI) and, currently, Richland Correctional Institution (RCI). Koger is a member of the Nyahbinghi Rastafarian Order and believes that he must allow his hair to grow naturally, resulting in dreadlocks, keep an Ital diet, observe fasting periods, and gather with other Rastafarians in services called groundings.

### A. Koger's Accommodation Requests and ODRC's Responses

Between 2006 and 2018, Koger submitted numerous requests, appeals, and letters to ODRC asking for religious accommodations and exemptions. On August 23, 2006 and again on November 15, 2006, Koger completed ODRC "Request for Religious Accommodation" forms. R. 50-1, PID 494, 497. On both forms, Koger listed his religion as Rastafari and requested an accommodation to grow his hair in dreadlocks. As the basis of his request, Koger referenced the Bible and the Kebra Negast, an important text in the Rastafarian tradition.

ODRC then completed a "Response To Request For Religious Accommodation" form, which contained fields with input from several ODRC officials. The "Chaplain Recommendation" stated that "the growing of dreadlocks is considered the sign of commitment to the Rastafarian lifestyle and faith." *Id.* at 495. The "Security Response," however, stated, "[P]lease decline request," and the "Warden's Decision" indicated the request was disapproved. *Id.* ODRC then sent Koger a letter dated January 9, 2007, which stated, "[Y]our request to grow dreadlocks has been denied because according to DRC policy dreadlocks possess a security issue." *Id.* at 496.

On February 3, 2007, Koger submitted a letter to Gary Sims, ODRC's Religious Services Administrator.  Koger's letter offered a further explanation of his request:

> Our hair can be kept neat never covering the ears and can be subjected to searches at anytime.  The tams would also keep the hair presentable cover our hair in the diner area and never over our ears.  The locks on our head are an essential part of Rastafari.  I must keep my lock as an offerring to be given to the most high on judgment day.  Without my locks I have no offerring and without that I am not look upon as who I am it states this in the bible in Numbers 6 the law of the Nazarite.

*Id.* at 498.[1]

On December 16, 2009, Koger completed another ODRC accommodation form and requested "'Kosher meals' <u>non beef</u> <u>non pork</u> <u>non soy</u> it contains M.S.G. monosodium glutamate as well as other food served in the kitchen containing season enhancer not natural."  *Id.* at 488. Koger explained, "The practicing Rastafari lives every day on the basis of his Haimanot-beliefs. . . . This is called Ital.  It is found in the Kebra Negest, Fetha Negest, The Livity, The bible, and Nyanbingi teachings."  *Id.*  Koger also listed the contact information for the "Rastafarian Universoul Order" in North Carolina and the names of two religious leaders.  *Id.*

Koger's request was again "disapproved" by the Warden on January 4, 2010.  *Id.* at 487. The "Chaplain Recommendation" stated, "[T]he department of rehabilitation and correction has not set up any special dietary requirements for those of the Rastafarian religious group."  *Id.* ODRC then sent Koger a letter dated January 11, 2010, which stated, "[Y]our request to receive Kosher meals has not been approved.  Keeping Kosher is not a vegetarian diet and is provided to those keeping an orthodox Jewish tradition.  A vegetarian alternative is provided at each meal upon the request of any individual."  *Id.* at 486.

On January 14, 2010, Koger submitted an "Appeal of Decision Regarding Religious Accommodation" that emphasized his request for "Ital food."  *Id.* at 491.  He asserted that ODRC had not "engaged in any form of verification as to the mandates of adherents to the specific belieths.  A policy for Rastafari in O.D.R.C. has to start somewhere, if the chaplain does

---

[1]Koger's submissions contain misspellings and grammatical errors.  They are reproduced here as they appear in the record.

not assist us how is there ever going to be 'requirements' for those of the Rastafari religious group." *Id.* He then explained:

> The veggie meals do not meet the proper dietary needs of Rastafari. They are perpare next to regular meals with the same tools, not by a practicing Rastafari and also contains all the same flavor enhancers or seasoning salt as regular meal as well as all veggie supplements in T.O.C.I. contain soy contents the paper work the chaplain received from elders of Rastafari clearly states when provisions are not met Kosher food are more acceptable then none at all. And it has been made clear to the chaplain that Rastafari are the offspring of orthodox Jews staten claim to Falasha of Ethiopia the original African Jew of Ethiopia orthodox church which share if not all, most of the same traditions.

*Id.* A month later, Koger received a response from ODRC, signed by Sims, which stated that Koger's "[r]equest to have kosher meals for religious reasons" was "[n]ot approved." *Id.* at 489.

Koger submitted another letter, dated March 3, 2010, to "Mr. G. Simms," asking for an explanation "about the reasons to my dietary needs as Rastafari not being accommodated." *Id.* at 485. The next day, ODRC sent Koger another letter signed by Sims which again denied Koger's request without additional comment.

On July 8, 2013, Koger filled out a "Request To Change Religious Affiliation," requesting to change his affiliation to Muslim. *Id.* at 482. Koger listed only "Ramadon" as a reason for requesting the change. *Id.*

On August 24, 2016, Koger wrote another letter complaining that he had "been force cut . . . while being held in the O.D.R.C." *Id.* at 501. Koger asserted, "[M]y nati has been uncut untrim unshaven throughout each . . . transfer. I have successfully been through all security protocol, plenty of times including visitations my hair has been searched and cleared by correction officer at four institutions of O.D.R.C." *Id.* at 501-02. He also stated, "I have to fast with the Muslims . . . during Ramadon and observe church on Sundays with the Christians. If I need assistance from T.C.I. as to my fasting and observance I have to get it with other religious observances not Rastafari." *Id.* at 502-03.

In June of 2016, Koger "was informed that TCI would remove [his] dreadlocks." *Id.* at 475. Koger stated that he "attempted to receive an exemption through several levels of appeal and was denied." *Id.* Then on September 21, "Deputy Warden Bowen issued [Koger] a direct order to cut [his] dreadlocks." *Id.* According to Koger, when he told ODRC officials that he would not comply with the order because of his religious beliefs, they responded that he "could not receive a religious accommodation for [his] dreadlocks because Rastafarianism is not recognized by ODRC." *Id.* Because of his refusal, Koger "was placed in the segregation unit." *Id.*

On October 6, 2016, Koger submitted a "Notice of Disciplinary Appeal," contesting a decision by the Rules Infraction Board:

> I have been exempted since 2008 because I am Rastafari. As resently as 2013 in Allen Corr. Inst. I was written up for the same 21 rule violation and found not guilty in R.I.B. My accommodation stated until hair is deemed a security risk, it shall be left as is. My hair is still not deemed a security risk, no one has accused me of having anything in it, no one has asked to search it! Just because T.C.I. do not have a policy on Rastafari do not mean Rastafari do not exist. This placement and threat of cutting is a violation of Federal statute: R.L.U.I.P.A.

*Id.* at 506.

On October 28, 2016, Koger completed another ODRC accommodation request form. He requested an "exemption from grooming policy, to grow hair naturally allowing hair to take its natural course in locks." *Id.* at 480. He stated that his request was supported by the "Rastafari – Livity; written by Ras Anbessa-Ebanks; The Kebra Negast all mansions of Rastafari grow their hair naturally for locks to form it is mandate for the true Rasta. It is found in the Bible as well as the other books mentioned above." *Id.* Koger provided several names and two addresses at which religious leaders could be contacted.

On November 2, 2016, "TCI staff arrived at [Koger's] cell to cut [his] dreadlocks." *Id.* at 475. According to Koger, this date was significant because it "is the most sacred day of the year, and it commemorates the coronation of Haile Selassie as Emperor of Ethiopia." *Id.* at 476. Koger stated, "When I refused to have my dreadlocks cut, I was covered with oleoresin capsicum

spray, and my dreadlocks were shaved off without my consent." *Id.* Koger's hair had been "force cut" by ODRC on four prior occasions. R. 32, PID 323-24.

On November 8, 2016, ODRC responded to Koger's October 28 request via an ODRC form signed by the warden. The "Chaplain Recommendation," "Accommodation Review Committee Response," and "Warden's Decision" each cited the ODRC grooming policy to deny the accommodation request. R. 50-1, PID 479. ODRC then sent Koger a letter dated November 30, 2016, which stated, "Your request . . . for hair exemption is disapproved. This is not a religious issue." *Id.* at 478.

The same day, Dr. Michael Davis, religious services administrator, sent Koger a letter that stated, "[T]he documentation submitted does not include the DRC 4327 Response to Request for Religious Accommodation. Therefore, I am returning your DRC form 4326 Request for Religious Accommodation for complete processing through the institution Chaplain." *Id.* at 481.

On April 11, 2018, Koger again requested to change his affiliation to Islam, stating that he had "been participating for the last sixteen years" in Ramadan. *Id.* at 499.

On April 26, 2018, Koger submitted yet another accommodation request. He requested "growing of natural locks (wearing of dreads)," "Ital diet (organic food, vegetarian no soy)," "tams . . . (religious head wear)," and "observance/reading material/fasts days/holidays." *Id.* at 500. He again listed the religious texts from his previous requests and listed several religious leaders who could verify the request.

On June 18, 2018, ODRC completed a response to Koger's requests "1) to grow his hair in locks, 2) to receive organic veggie and/or vegetarian meals (Ital meals), 3) to have and wear religious head covering (tam), 4) to order Rastafarian literature and 5) to observe Rastafarian holidays and fast days." R. 52-2, PID 577. This request was apparently "referred to Chief Michael Davis, Religious Services Administrator." *Id.* The response appears to have approved Koger's requests to wear a tam and order Rastafarian literature, but denied Koger's request to grow his locks, and stated that "DRC provides a reasonable meal accommodation." *Id.* The request to observe fasts and holidays was apparently not addressed.

On August 27, 2018, Koger submitted the latest accommodation request in the record. He requested accommodations to let his "locks grow naturally to have 'ital' to keep 'tam' to have grounding, and observance of holidays and fast days." R. 52-2, PID 578. He listed the same religious texts found in his previous requests and again listed several religious leaders.

## B.  ODRC's Grooming Policy

In a separate lawsuit, an inmate challenged ODRC's prior grooming policy that categorically prohibited dreadlocks. *Glenn v. Ohio Dep't of Rehab. & Corr.*, No. 4:18 CV 436, 2018 WL 2197884 (N.D. Ohio May 14, 2018). In *Glenn*, the district court granted the plaintiff's request for a declaration that the grooming policy, as applied, violated RLUIPA and enjoined enforcement of the policy against the plaintiff. *Id.* at *7.

Following *Glenn*, ODRC issued a revised policy that went into effect on October 22, 2018. The revised policy states:

> Inmates' hair must, at all times, remain readily and thoroughly searchable for contraband. Hair that is in such condition that it cannot be readily and thoroughly searched is prohibited and shall be subject to forced cutting . . . . For purposes of this rule, "searchable" shall mean that it can be determined, through ordinary search procedures, whether the inmate's hair contains contraband. Ordinary search procedures include, but are not limited to, passing a hand-held metal detector over the inmate's hair and scalp to determine whether any metal objects are present and/or directing the inmate to turn his head upside-down and run his fingers vigorously through his hair.
>
> Braids and dreadlocks may be worn subject to the limitations of this rule and provided that the thickness of each individual braid or dreadlock does not exceed ½ inch. The following hairstyles or facial hair are not permitted: Initials, symbols, dyes, multiple parts, hair disproportionately longer in one area than another (excluding natural baldness), and weaves. Other hairstyles not specifically listed herein may be prohibited if they are determined to be either a threat to security or contrary to other legitimate penological concerns, as determined by the office of prisons. The warden may impose restrictions or authorize exemptions to these prohibitions for documented medical or mental health reasons, in conjunction with medical or mental health treatment, or to accommodate a sincerely held religious belief.

R. 45-3, PID 433. In his declaration, Brian Wittrup, chief of the bureau of classification and reception for ODRC, explained the rationale behind the new policy:

[S]earches of dreadlocks that do not exceed the ½ inch thickness limitation would require inmates to invert their heads and vigorously run their fingers through their hair while corrections officials conduct a visual inspection to determine whether there were any hidden objects in the hair, whether any objects fell out of the hair, or whether anything appeared to move in the hair. If no objects are observed, and if nothing falls out and/or moves, the inmate's hair would be considered searchable.

The rule also permits officials, in their discretion, to use a hand-held metal detector on the inmate's hair and scalp to determine whether any metal objects are present in the hair that were not detected through other search procedures.

If the inmate's dreadlocks exceed the ½ inch thickness limitation, the hair would be considered unsearchable. When hair exceeds ½ inch thickness, small objects such as paper clips, handcuff picks (metal and plastic), razor blades, handcuff keys, non-metal thin piercing weapons, are difficult or nearly impossible to detect with metal detectors and are unlikely to fall out during a search. Discovery of such objects through the manual search of hair also risks injury to the corrections officer conducting the search.

. . .

If an inmate's hair exceeds the ½ inch thickness limitation, he/she may request an exemption from ODRC's grooming rule in order to accommodate a sincerely held religious belief. In such cases, however, the hair must still be determined to be searchable after a particularized inquiry.

R. 45-1, PID 428.

Rossi Azmoun, a warden's assistant for ODRC, stated that on April 5, 2019, he "was asked to photograph inmate Cecil Koger's dreadlocks" and "[o]n April 8, 2019, each of inmate Koger's dreadlocks was approximately one-half inch in thickness or less." R. 52-4, PID 592. According to Azmoun, Koger's dreadlocks were searchable and did not pose a security risk.

**C. Procedural History**

Koger brought suit on November 16, 2017, asserting claims under the RLUIPA and 42 U.S.C. § 1983. Defendants moved for summary judgment. Koger opposed summary judgment and filed a motion to strike or disregard evidence contained in Defendant's reply, including, as relevant here, six photographs of Koger taken by Azmoun. The district court denied Koger's motion to strike the photographs and granted summary judgment to Defendants. Koger appeals.

## II. Analysis

"We review the district court's grant of summary judgment de novo." *Williams v. Wilkinson*, 134 F.3d 373 (6th Cir. 1997) (per curiam). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e accept the 'most favorable view of the facts to the plaintiff for purposes of the appeal.'" *Maye v. Klee*, 915 F.3d 1076, 1082 (6th Cir. 2019) (quoting *Thompson v. Grida*, 656 F.3d 365, 367 (6th Cir. 2011)).

### A. RLUIPA

"Congress enacted RLUIPA . . . 'in order to provide very broad protection for religious liberty.'" *Holt v. Hobbs*, 574 U.S. 352, 356 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 693 (2014)). "To establish a cognizable claim under RLUIPA, the inmate must first demonstrate that a prison policy substantially burdens a religious practice." *Haight v. Thompson*, 763 F.3d 554, 559-60 (6th Cir. 2014). If the inmate makes this showing and "the practice is traceable to a sincerely held religious belief" then "the prison policy survives only if it serves a compelling governmental interest in the least restrictive way." *Id.* at 560.

### 1. Dreadlocks

On appeal, we are not presented with claims regarding the "force cutting" of Koger's locks. The issue before this court is limited to the validity of the ODRC grooming policy, which Koger argues cannot survive the compelling interest and least-restrictive means analysis.

Appellees do not dispute that Koger's desire to grow dreadlocks is grounded in a sincerely held religious belief. Instead, Appellees argue that ODRC's current policy regarding dreadlocks does not burden Koger's religious practice because "there is no evidence anywhere in the record 1) that Appellant's dreadlocks presently exceed the 1⁄2 inch thickness limitation; 2) that Appellant has requested an exemption for religious accommodation under ODRC's revised grooming policy; or 3) that Appellant's hair was determined to be unsearchable after a particularized inquiry." Appellees' Br. at 3.

In his affidavit, Koger stated that his "dreadlocks naturally grow thicker than ½ inch." R. 50-1, PID 476. Appellees argue that "[t]he thickness of Appellant's dreadlocks was readily apparent to anyone who could see him, whether in person or in a photograph" and point to photos of Koger to show that they do not exceed one-half inch in thickness.[2] Appellees' Br. at 10. The photographs, however, do not provide the scale or perspective sufficient to establish the thickness of Koger's locks. As the district court concluded, Koger's "affidavit, construed in the light most favorable to him, demonstrates his personal knowledge that his locks naturally grow thicker than ½ inch." R. 56, PID 658.

This does not end the inquiry, however. Even if Koger's locks grow thicker than one-half inch, the policy allows him to receive an exemption upon request and an individualized determination that his hair is searchable.[3] Although Koger asserts that "Wittrup did not describe how ODRC would determine whether a dreadlock over one-half inch was 'searchable,'" he does not dispute that Appellees would make such a determination. Appellant's Br. at 10. Before the district court, Appellees asserted that "[i]f prison officials determine, after a particularized inquiry, that the inmate's hair is incapable of being searched, only the offending braid or dreadlock(s) need be combed out or cut to ensure prison safety and security, thereby leaving the inmate's remaining hair untouched." R. 45, PID 416. Although Koger could establish that the removal of his locks burdens his religious practice, ODRC will not remove them under the current grooming policy unless Koger's hair is deemed unsearchable. Koger, however, has not

---

[2]Appellees waived their argument that Koger failed to request an exemption from the revised grooming policy. As the district court noted:

> [B]y waiting until their reply brief to argue that Plaintiff failed to exhaust his administrative remedies, this argument is waived. *See Hunt v. Big Lots Stores, Inc.*, 244 F.R.D. 394, 397 (N.D. Ohio 2007) (declining to consider defendants' arguments raised for the first time in their reply brief); *Irwin Seating Co. v. Int'l Bus. Machines Corp.*, No. 1:04-CV-568, 2007 WL 518866, at *2 n.2 (W.D. Mich. Feb. 15, 2007) ("Moreover, the Sixth Circuit repeatedly has recognized that arguments raised for the first time in a party's reply brief are waived.").

R. 56, PID 651. Appellees do not challenge this determination.

[3]Koger does not argue that making such a request or submitting to such an assessment would substantially burden his religious practice. And Koger does not object to anything short of removing his locks:

> I am not opposed to ODRC facilities searching my dreadlocks by any other reasonable means other than cutting my dreadlocks, including with metal detectors, x-rays, or other imaging technology, or by manual searching ODRC staff members with additional safety equipment and/or personnel.

R. 50-1, PID 477.

alleged or offered evidence demonstrating that his hair is unsearchable, naturally grows to be unsearchable, or that ODRC has or will deem it to be unsearchable. Koger has not shown that the policy prevents him from growing his locks naturally and, therefore, cannot "demonstrate that [the] prison policy substantially burdens [his] religious practice." *Haight*, 763 F.3d at 559-60.

## 2. Ital Diet and Fasting

Again, to establish a claim under RLUIPA, Koger must "demonstrate that a prison policy substantially burdens a religious practice." *Id.* Koger asserts that his religion "requires adherence to a specific diet" and "requires him to observe specific fasting periods." Appellant's Br. at 5. He argues that ODRC failed "to identify any interest whatsoever for denying [his] dietary accommodation." *Id.* at 28.

Appellees do not dispute that Koger's diet and fasting requests are grounded in a sincerely held religious belief. Instead, they respond that Koger's "sole submission requesting to fast as a Rastafarian, an *ital* diet or to have 'grounding' was dated August 27, 2018 (more than two months *after* Appellant's Complaint was filed), and provided no meaningful detail with which ODRC officials could evaluate the feasibility of the requests" Appellees' Br. at 4. Appellees assert that Koger's request to fast "did not include any specifics" that would allow ODRC to evaluate the request. *Id.* at 25. Appellees also provide a discussion of the Fetha Negast and distill their own interpretation of Koger's religious beliefs.[4] Appellees suggest, without pointing to any evidence in the record, that Koger's religious practice was not burdened because he was provided the ability to fast and keep an Ital diet:

> Appellant could have observed the Rastafarian fast days he now claims by visiting the chow hall because, on most of these fast days, he was permitted to eat such things as fruit, rice, potatoes, pasta, bread, vegetables, fruit juice products, and water. On some of the other fast days, Appellant could select food from whatever vegetarian meals were being served at the chow hall that day so long as they

---

[4]As noted above, Koger also claims his practices are based in the Kebra Negast, the Livity, the Bible, and Nyahbinghi teachings.

contained no dairy or eggs or, alternatively, eat food purchased from the commissary.

*Id.* at 27-28.

Between 2009 and 2018, through accommodation requests, appeals, and letters to ODRC, Koger repeatedly requested accommodations for his religious diet, including both fasting days and Ital food. Koger alleges that he "provided pamphlets and guides, explaining the tenets of Rastafarianism including . . . the fasting dates, to ODRC staff on multiple occasions." R. 1, PID 7; R. 32, PID 317. As discussed above, Koger also provided ODRC with details of his diet. Still, Koger stated in his declaration that "ODRC will not allow [him] to fast as a Rastafarian," and that he and other Rastafarians must "diet and fast under . . . Muslim accommodations simply because it is their best opportunity to practice according to their religious beliefs." R. 50-1, PID 474. Therefore, Koger has sufficiently shown that Appellees burdened his religious practices of fasting and keeping an Ital diet.

Appellees must then show the policy "serves a compelling governmental interest in the least restrictive way." *Haight*, 763 F.3d at 559-60. At the time of Koger's requests, ODRC provided three explanations for denying them:

- On December 12, 2009, an ODRC official wrote, "the department of rehabilitation and correction has not set up any special dietary requirements for those of the Rastafarian religious group." R. 50-1, PID 487.

- On January 11, 2010, an ODRC official wrote, "your request to receive Kosher meals has not been approved. Keeping Kosher is not a vegetarian diet and is provided to those keeping an orthodox Jewish tradition. A vegetarian alternative is provided at each meal upon the request of any individual." R. 50-1, PID 486.

- On June 18, 2018, an ODRC official wrote, "DRC provides a reasonable meal accommodation." R. 52-2, PID 577.

And Appellees' brief to this court does little to clarify these justifications, arguing only that Koger did not provide sufficient information for the evaluation of his requests.

The proffered justifications for denying Koger's requests are insufficient. ODRC's 2009 response was inadequate because "[w]hen Congress offers *new* free-exercise protections from the State for their citizens, as it did in enacting RLUIPA in 2000, it should come as no surprise

that the State cannot deny an accommodation request on the ground that the request is . . . new." *Haight*, 763 F.3d at 562. ODRC's 2010 response did not address Koger's request for an Ital diet and suggests that it did not thoroughly review his submissions. ODRC's 2018 response is belied by Koger's later accommodation request on August 27, 2018, requesting "to have 'ital' . . . and observance of holidays and fast days." R. 52-2, PID 578. As for the justification asserted in Appellees' brief—that Koger provided insufficient information—"explanations offered for the first time in litigation ought to come with a truth-in-litigating label, requiring the official to disclose whether the new explanations motivated the prison officials at the time of decision or whether they amount to post hoc rationalizations. Only the true explanations for the policy count." *Haight*, 763 F.3d at 562. The record does not indicate that any ODRC official was concerned about the lack of specificity in Koger's requests prior to this litigation.[5] Because Appellees do not present any government interest to justify the denial of Koger's religious diet requests, summary judgment is improper.

### 3. Communing with Others

In his statement of the issues, Koger notes that the district court found he "has not shown he is prohibited from dieting, fasting, or communing with others in accordance with his religious beliefs" and asks if "the district court err[ed] in its application of the summary judgment standard." Appellant's Br. at 2. However, Koger does not develop an argument regarding his communing request and it is unclear if he appeals this aspect of the district court's order.

In his declaration, Koger stated that he requested "to have communion with other Rastafarians through 'groundings.'" R. 50-1, PID 472. Koger further stated that his "faith also requires [him] . . . to celebrate religious holidays in worship services called 'groundings.'" *Id.* at 473. On August 27, 2018, Koger requested "to have grounding." R. 52-2, PID 578. The record does not include any other evidence regarding Koger's religious practice, his requests to ODRC, or ODRC's response. It is therefore not clear that ODRC denied Koger the ability to commune

---

[5]Further, Appellees' argument that Koger failed to fill out the required forms with sufficient detail is a repackaging of its argument that Koger failed to exhaust administrative remedies. Appellees, however, waived this argument.

with fellow Rastafarians. On this limited evidence, Koger has not demonstrated a genuine dispute of material fact regarding his communing claim.

## B. Free Exercise

Koger asserts that ODRC "violate[d] the First . . . Amendment[] by infringing on Koger's religious exercise." Appellant's Br. at 29. "In any free exercise claim, the first question is whether 'the belief or practice asserted is religious in the [plaintiff's] own scheme of things' and is 'sincerely held.'" *Maye*, 915 F.3d at 1083 (alteration in original) (quoting *Kent v. Johnson*, 821 F.2d 1220, 1224 (6th Cir. 1987)). "Next, where an inmate challenges prison policies under the Free Exercise Clause, Supreme Court precedent instructs us to follow the standard formulated in *Turner v. Safley* . . . ." *Id.* (citation omitted). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

"'To ensure that courts afford appropriate deference to prison officials,' the Supreme Court has 'determined that prison regulations alleged to infringe constitutional rights are judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.'" *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)). "The *Turner* Court outlined four factors that are relevant in determining the reasonableness of a challenged prison regulation." *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999). "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)). If there is not, "the regulation is unconstitutional, and the other factors do not matter." *Spies*, 173 F.3d at 403. The next three factors are balanced and considered together:

> (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives" available "that fully accommodate the prisoner's rights at de minimis cost to valid penological interests."

*Id.* (quoting *Turner*, 482 U.S. at 90-91).

**1. Dreadlocks**

Koger argues that "ODRC has not identified any evidence whatsoever to connect a ban on one-half-inch dreadlocks to the security of the facility," and that there are "genuine issues of material fact as to whether ODRC has a valid interest in banning dreadlocks over one-half inch." *Id.* at 31, 33. As discussed in the RLUIPA context, Koger has not sufficiently shown that ODRC's grooming policy burdens his religious beliefs and practices. And RLUIPA extends "the protections offered to the free-exercise rights of inmates beyond those offered under the Constitution." *Haight*, 763 F.3d at 561-62. Because he has not shown the requisite burden, Koger has not demonstrated a genuine dispute of material fact as to his free-exercise claim regarding the grooming policy. *See Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 460 (6th Cir. 2019) ("When a prison policy singles out *and substantially burdens* a prisoner's sincere beliefs, the First Amendment requires us to ask whether the policy serves a valid penological interest.") (emphasis added).

**2. Ital Diet and Fasting**

Koger argues that, "[v]iewing the evidence and inferences in his favor, [he] validly pleaded and supported valid constitutional claims against the ODRC Defendants for failing to accommodate his religious diet." Appellant's Br. at 36. As discussed in the RLUIPA context, Koger has sufficiently demonstrated that the denial of his diet and fasting requests burdened his religious beliefs and practices. Thus, ODRC must demonstrate "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (quoting *Block*, 468 U.S. at 586). If it cannot make this showing, "the regulation is unconstitutional, and the other factors do not matter." *Spies*, 173 F.3d at 403. As discussed above, Appellees have not articulated any justification with a valid, rational connection to the denial of Koger's diet requests. Therefore, ODRC is not entitled to summary judgment on Koger's First Amendment claim regarding his religious diet.[6]

---

[6]We note that Appellees sought qualified immunity only with respect to Koger's forced-locks-cutting claims, and asserted no qualified-immunity defense to his religious-diet claims. The issue is thus not before us.

**C. Equal Protection**

Koger argues that ODRC "made the conscious decision to treat Koger and other Rastafarians differently than adherents of other religions, and . . . allows Koger to fast as a Muslim observing Ramadan, but will not allow him to fast as a Rastafarian." Appellant's Br. at 37. Koger further argues that "[a] facially discriminatory distinction between two religions burdens an inmate's fundamental rights to religious freedom under the First Amendment, and creates the inference of invidious discrimination in violation of the Equal Protection Clause." *Id.* at 37-38.

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Clause embodies the principle that all persons similarly situated should be treated alike." *Maye*, 915 F.3d at 1085 (quoting *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006)). "[T]o establish an equal protection violation, a plaintiff must establish more than differential treatment alone—a discriminatory intent or purpose is required." *Id.* However, "we treat 'as presumptively invidious those classifications that disadvantage a "suspect class," or that impinge upon the exercise of a "fundamental right."'" *Id.* (quoting *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982)); *see also Harbin-Bey v. Rutter*, 420 F.3d 571, 576 (6th Cir. 2005) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)) ("[W]hen a law adversely affects a 'suspect class,' such as one defined by race, alienage, or national origin, or invades a 'fundamental right,' such as speech or religious freedom, the law will be sustained only if it is 'suitably tailored to serve a compelling state interest.'").

In *Maye,* we considered a Muslim inmate's claim under 42 U.S.C. § 1983 that Michigan Department of Corrections (MDOC) officials deprived him of his First and Fourteenth Amendment rights by preventing him from participating in Eid, a religious feast. 915 F.3d at 1079. MDOC officials told Maye "he could only attend Eid if he changed his religion from Nation of Islam to Al-Islam." *Id.* We first considered "whether the plaintiff's version of the facts allege[d] the deprivation of a constitutional right." *Id.* at 1082. We noted that Maye was similarly situated to those who were allowed to participate in the feast, yet officials decided to treat members of Al-Islam differently from Maye and other members of the Nation of Islam. *Id.*

at 1086.  We concluded that Maye "sufficiently alleged that [MDOC] deprived him of his right to equal protection under the law" and that "[a]ny reasonable MDOC employee would have known that preventing a Muslim inmate from attending Eid violated the First and Fourteenth Amendments." *Id.* at 1086-87.

Viewing the evidence and drawing inferences in Koger's favor, ODRC's actions violated the Equal Protection Clause.  In his declaration, Koger stated that he "fasted during Ramadan in the past because it occasionally aligns with the fasting days observed by Rastafarianism" and because ODRC did not allow him "to fast as a Rastafarian . . . without being subject to discipline." R. 50-1, PID 474.  Koger knows "other Rastafarians in ODRC facilities who diet and fast under the same Muslim accommodations simply because it is their best opportunity to practice according to their religious beliefs." *Id.*  Koger further stated, "If ODRC facilities allowed Rastafarians to receive diet and fasting accommodations, I would not be forced to request exemptions as a Muslim simply so that I may practice my religion more faithfully." *Id.* at 475.  Appellees do not refute these statements or point to any contrary evidence in the record.  Instead, Appellees argue that Koger's requests lacked detail and that Koger "did not show he was prohibited from practicing his religion on the basis of purposeful discrimination." Appellees' Br. at 5.  As in *Maye*, however, "a facially discriminatory distinction between" Islam and Rastafarianism "would burden [Koger's] fundamental rights to religious freedom under the First Amendment, which means an invidious purpose may be inferred.  Therefore, [Koger] has sufficiently alleged that [ODRC] deprived him of his right to equal protection under the law." 915 F.3d at 1086.

### D.  Federal Rule of Civil Procedure 35

Before the district court, Koger filed an opposition to Defendants' motion for summary judgment on April 3, 2019.  Defendants filed a reply to Koger's opposition and attached photos of Koger taken by Azmoun, ODRC's warden's assistant.  Azmoun took the photos between April 5 and April 8, 2019.  Koger then filed a motion to strike, arguing, in part, that the photos should be disregarded.  The district court denied the motion, asserting that Koger "provide[d] no legal authority for the proposition that the taking of a photograph constitutes a physical

examination under Rule 35" and that "the rule's plain language [did not] support Plaintiff's broad reading of the term 'physical examination.'" R. 56, PID 647-48.

In his brief to this court, Koger argues that "[w]hen a party's physical state is at issue in a case—as Koger's dreadlocks are here—examining the party requires a court order," and that Appellees "simply ignored the Federal Rules of Civil Procedure, and, without a motion, photographed the opposing party to collect evidence without notifying his counsel or the court." Appellant's Br. at 38-39. Therefore, Koger argues, the district court abused its discretion by denying his motion to strike.

Under Rule 35 of the Federal Rules of Civil Procedure, a court "may order a party whose mental or physical condition . . . is in controversy to submit to a physical or mental examination." Such an order "may be made only on motion for good cause and on notice to all parties and the person to be examined" and it "must specify the time, place, manner, conditions, and scope of the examination." Fed. R. Civ. P. 35(a)(2)(A), (B).

Koger is right to note that the taking of photographs "effectively extended the discovery deadline for ODRC only, after Koger had argued there was not a sufficient factual record to grant ODRC's motion for summary judgment." Appellant's Br. at 42. However, we need not resolve whether photographing Koger constituted an examination for purposes of Rule 35. "Rule 61 of the Federal Rules of Civil Procedure requires the court to 'disregard all errors and defects that do not affect any party's substantial rights.'" *Maxwell v. Dodd*, 662 F.3d 418, 422 (6th Cir. 2011). Other than noting the existence of the photographs to address Koger's argument, the district court did not rely on the photographs to reach any of its conclusions. And because no measurement is provided, the photos do not reveal the thickness of Koger's locks and do not contribute to the record in any way relevant to the arguments of the parties. Even if photographing Koger was improper, and even if the district court committed error, Koger has not shown that his substantial rights were affected.

### III. Conclusion

In sum, we affirm the grant of summary judgment as to Koger's claims regarding his dreadlocks, communing with others, and Rule 35. We reverse the grant of summary judgment as to Koger's claims regarding his religious diet and fasting and remand for further proceedings.