RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0269p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

LYLE M. HEYWARD,

*Plaintiff-Appellant*,

*v.*

HEATHER COOPER; CHRIS LAMBERT; JAMES
HAVILAND, Warden; JOANNA FACTOR; C. FOSTER;
CORI SMITH; ALLISON GIBSON; K. RIEHLE; C. ESTER;
P. ENGLES; IMAM IBRAHIM S. ABDUL-RAHIM; B.
GUISE; D. SZABADOS; M. LADESMA; J. CASEY; AMY
MARBURGER; K. BASINGER; M. GIDDENS; I.L.
COLLIER; MIKE DAVID; ALLYSA DAMSCHRODER; K.
LUDWIG; K. MYERS; M. CHRISTEN, in their individual
capacities; B. POTTS,

*Defendants-Appellees*.

> No. 22-3781

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Toledo.
No. 3:19-cv-02499—Jeffrey James Helmick, District Judge.

Argued: July 20, 2023

Decided and Filed: December 13, 2023

Before: GILMAN, LARSEN, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Samuel Weiss, RIGHTS BEHIND BARS, Washington, D.C., for Appellant. Adam
Beckler, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees
Davis, Haviland, Riehle, Foster, Factor, Smith, Gibson, Lambert, Ester, Engles, Guise, Szabados,
Ladesma, Casey, Giddens, Collier, Ludwig, Myers, Christen and Potts. Shaka S.J. Sadler,
DICKIE, MCCAMEY & CHILCOTE, P.C., Cleveland, Ohio, for Appellees Damschroder and
Cooper. **ON BRIEF:** Samuel Weiss, RIGHTS BEHIND BARS, Washington, D.C., for
Appellant. Mindy Worly, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio,
for Appellees Davis, Haviland, Riehle, Foster, Factor, Smith, Gibson, Lambert, Ester, Engles,
Guise, Szabados, Ladesma, Casey, Giddens, Collier, Ludwig, Myers, Christen and Potts. Kristin

L. Wedell, DICKIE, MCCAMEY & CHILCOTE, P.C., Cleveland, Ohio, Michelle A. Thomas, DICKIE, MCCAMEY & CHILCOTE, P.C., Grosse Pointe Farms, Michigan, for Appellees Damschroder and Cooper.

NALBANDIAN, J., delivered the opinion of the court in which LARSEN, J., joined in full. GILMAN, J. (pp. 19–22), delivered a separate opinion concurring in part and dissenting in part.

_____

**OPINION**

_____

NALBANDIAN, Circuit Judge. Proceeding pro se in district court, Lyle Heyward filed a complaint alleging that prison officials frustrated his attempts to celebrate Ramadan in violation of the First and Fourteenth Amendments and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). He also alleges that officials retaliated against him for filing grievances in violation of the First Amendment. The district court dismissed Heyward's claims. We affirm in part and reverse in part.

**I.**

Every year Muslims observe Ramadan, a month of fasting, prayer, reflection, and community. Heyward filed a pro se complaint alleging that prison officials interfered with his ability to celebrate Ramadan in 2018 when he was incarcerated at the Allen Oakwood Correctional Institution ("AOCI"). He also alleges that officials retaliated against him for filing grievances stemming from events surrounding Ramadan.

According to Heyward, officials burdened several of his sincerely held religious beliefs. First, he alleges that "Defendants Cooper, Smith, Engles, Al-Hagg, and Factor . . . knowingly and systematically allowed non-Muslims to prepare and serve food during Ramadan," Compl., ECF. No. 1, PageID 4–5, even though "[i]t is a sincerely held mandatory tenet belief of [his] that the food which is prepared, specifically during Ramadan, is to be both prepared and served by Muslims only," *id.* at PageID 4. This happened while Defendants "allow[ed] Prisoners of other faith groups" to, for example, have access to Kosher food or properly prepared communion. *Id.*

Heyward next alleges that "Defendants Cooper, Smith, Engles, Al-Hagg, Davis, and Factor, while allowing other AOCI faith groups" to meet congregationally and access religiously-significant foods (e.g., Christians receiving communion and congregating for prayer or retreats, or members of the Jewish faith receiving Rosh Hashanah and Yom Kippur meals), "refused to allow" Muslims to congregate and "never provided Dates for the entirety of Ramadan." *Id.* at PageID 5 (emphasis omitted). This occurred despite the "sincerely held mandatory tenet belief of [his] that the Ramadan fast be broken congregationally . . . every day of Ramadan with Dates and Water" and a closing congregational "Du'a" (prayer). *Id.* And despite Heyward's belief that at the point that "each daily fast is officially broken, . . . all the Muslims are to eat their evening meal together/congregationally." *Id.* at PageID 6.

He also alleges that "Defendants Cooper, Smith, Engles, Al-Hagg, Marburger, Damschroder, Davis, and Factor knowingly and systematically denied [him] proper nutrition by only allowing [him] to receive between 750–1000 calories in total for each day." *Id.* Some Muslims were losing so much weight that "they had to quit observing Ramadan." *Id.*

In response, Heyward filed many grievances. And he alleges that officials retaliated against him for doing so. We'll summarize three alleged instances of retaliation. Once, "in an attempt to intimidate ('chill') . . . Heyward into not making any more complaints, he was threatened, by Defendant Foster, to be transferred out of AOCI to a higher security prison, with a trumped-up bad Conduct Report, in retaliation of his verbal and written complaints about how fantastically terrible the Ramadan food trays were." *Id.* And he alleges that he would be "subject to receiving additional prison time" from the Parole Board "for any Conduct Report received." *Id.*

On another occasion, Heyward and his "entire cell block" underwent drug tests. *Id.* at PageID 9. He claims that false positives were assigned to prisoners at random, including him. Defendant Szabados allegedly assigned a random cup to Heyward and told him that he tested positive for marijuana. Heyward alleges that refusing the drug test could affect his parole. An unknown officer said: "We'll break you yet Heyward!!" *Id.* at PageID 10. Szabados laughed. Heyward "then filed [a] complaint[]" for himself and "assisted sixteen (16) other [p]risoners in doing the same." *Id.* He alleges that AOCI granted all seventeen grievances. But rather than

dropping the issue, "Defendants Szabados, Ladesma, and Factor, upon learning that" Heyward "wrote all the [g]rievances on the matter, conspired together . . . and executed disciplinary action upon Heyward (and all other Prisoners caught up in the [] testing)." *Id.* at PageID 11.

Finally, Heyward asserts that he filed a grievance against Defendant Guise, who then retaliated against him. As the former Vice President of the AOCI Cultural Awareness Inmate Group ("CAA"), Heyward brought a theft problem to the attention of the President of CAA (a fellow inmate). "While making his complaint known to the CAA President, Defendant Guise abruptly began yelling directly at Heyward at the top of her lungs . . . 'Why is it always you!!?? Why is it always you!!?? I'm sick of your complaining!!!'" *Id.* at PageID 9 (emphasis omitted). Heyward believes she was referring to his other grievances "for what appeared to be the undue obstruction of various attempts of the CAA to show movies and other fundraising activities." *Id.* He then filed a grievance against her. In retaliation, Defendant Guise allegedly threatened CAA members: kick Heyward out of the organization or else the organization would be shut down. While less than clear, it appears that members voted Heyward out.

Heyward filed a complaint alleging that these actions violated RLUIPA, the First Amendment's Free Speech and Free Exercise Clauses, and the Equal Protection Clause of the Fourteenth Amendment. Defendants Cooper and Damschroder, both private contractors at AOCI, moved to dismiss. The district court granted their motion. Soon after, the State of Ohio, intervening on behalf of the remaining state officials (collectively, "State Defendants"), moved to dismiss. The district court also granted their motion. Heyward timely appealed.

**II.**

"We review a district court's dismissal of a complaint *de novo*." *McCarthy v. City of Cleveland*, 626 F.3d 280, 283 (6th Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We construe the complaint in the light most favorable to the plaintiff and accept as true all well-pleaded factual allegations. *Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010). We need not give legal conclusions and unwarranted factual inferences a

presumption of truth. *Iqbal*, 556 U.S. at 679. But we are mindful that "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).[1]

### III.

We start by addressing two procedural arguments. First, Defendants argue that Heyward forfeited the ability to raise his claims on appeal because Heyward did not file responses to their motions to dismiss. We disagree.

Parties ordinarily forfeit appellate review of any arguments that they fail to present in district court. *In re Hood*, 319 F.3d 755, 760 (6th Cir. 2003). And so we generally "will not consider arguments raised for the first time on appeal unless our failure to consider the issue will result in a plain miscarriage of justice." *Id.* (quoting *Overstreet v. Lexington–Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). From this prudential rule, we've explained that a plaintiff forfeits appellate review of arguments not raised "in the district court by virtue of his failure to oppose defendants' motions to dismiss." *Humphrey v. U.S. Att'y Gen.'s Off.*, 279 F. App'x 328, 331 (6th Cir. 2008).

That broad statement seems especially true in two scenarios. Scenario one: the defendant's motion to dismiss shifted the burden of proof to the plaintiff. For example, the defendant moves to dismiss for lack of subject-matter jurisdiction or asserts affirmative defenses, and the plaintiff doesn't respond below, instead wanting to respond to the affirmative defense or jurisdictional issue for the first time on appeal.[2] Scenario two: the plaintiff files a response to the

---

[1]Defendants do not raise qualified immunity as a defense, so we don't address it.

[2]"When the defendant challenges the existence of subject-matter jurisdiction, the plaintiff bears the burden of establishing that jurisdiction exists." *Lewis v. Whirlpool Corp.*, 630 F.3d 484, 487 (6th Cir. 2011). And when an affirmative defense is raised in the 12(b)(6) context, defendants carry the burden to show that the affirmative defense they assert applies. But if "the defendant meets this requirement then the burden shifts to the plaintiff to establish" why it shouldn't apply. *See Lutz v. Chesapeake Appalachia, LLC*, 717 F.3d 459, 464 (6th Cir. 2013) (quoting *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001)) (discussing the affirmative defense of a statute of limitations).

defendant's motion to dismiss and, on appeal, wants to make an argument not presented in that response.

Heyward's case does not fall cleanly into either scenario. He failed to respond to Defendants' motion to dismiss at all, but the motion did not shift the burden back to him. When confronted with the exact circumstances Heyward now faces, other circuits have held that if a plaintiff fails to respond to a motion to dismiss, the plaintiff is limited on appeal to challenging the legal grounds that the district court has given for its decision. *See Landor v. La. Dep't of Corr. & Pub. Safety*, 82 F.4th 337, 340 n.2 (5th Cir. 2023) (explaining that while "not pressing an argument before the district court often means it is forfeited, we generally conclude otherwise when the issue 'fairly appears in the record as having been raised or decided'" (quoting *Lampton v. Diaz*, 639 F.3d 223, 227 n.14 (5th Cir. 2011)); *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825–26 (7th Cir. 2015) (explaining that it is "well settled" that this "rule does not prevent a party from attacking on appeal the legal theory upon which the district court based its decision" (internal quotation marks omitted)).

This rule is consistent with our decision in *Cooper Butt ex rel. Q.T.R. v. Barr*, 954 F.3d 901, 904–05 (6th Cir. 2020). There we did not enforce the forfeiture rule when "the district court ruled on the merits of Defendants' motion based on Plaintiff's allegations in his complaint." *Id.* at 904. This is because even when the plaintiff does not respond to a motion to dismiss, the defendant will be on notice of the contents of the complaint and of the district court's basis for dismissing it, so the plaintiff may properly challenge the basis of the court's decision. *See United States v. Clariot*, 655 F.3d 550, 556 (6th Cir. 2011) ("When a district court resolves an issue, the losing party can challenge it."). To the extent the plaintiff wants to raise arguments that go beyond the legal grounds offered by the district court, the plaintiff forfeits those claims. *See Humphrey v. U.S. Att'y Gen.'s Off.*, 279 F. App'x 328, 331 (6th Cir. 2008) (holding that where the "plaintiff has not raised arguments in the district court by virtue of his failure to oppose defendants' motions to dismiss," the arguments have been forfeited). Then we can only consider these forfeited arguments if we choose to exercise our discretion to revive them. *See, e.g.*, *In re Hood*, 319 F.3d at 760; *Singleton v. Wulff*, 428 U.S. 106, 121 (1976).

These rules make sense when we consider the purpose of our forfeiture doctrine. It "is born of the need to 'ease appellate review by ensuring that district courts consider issues first, and to prevent surprise to litigants.'" *Harris v. Klare*, 902 F.3d 630, 636 (6th Cir. 2018) (quoting *Great Am. Ins. Co. v. E.L. Bailey & Co.*, 841 F.3d 439, 443 (6th Cir. 2016)). So it promotes order and efficiency on the one hand and notice on the other. These purposes are not satisfied when a plaintiff doesn't attempt to carry his burden below but then tries to on appeal, brings half of his arguments to the district court and saves the other half for our court, or attempts to raise new arguments that were not the basis of the district court's decision. This court's "function is to review the case presented to the district court, rather than a better case fashioned after a district court's unfavorable order." *Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 749 (6th Cir. 2005) (internal quotation marks omitted).

So where, like here, "the district court ruled on the merits of Defendants' motion [to dismiss] based on Plaintiff's allegations in his complaint," the plaintiff is entitled to challenge the district court's grounds for dismissing his complaint. *Cooper Butt*, 954 F.3d at 904–05. This exception doesn't flout the purposes of our forfeiture doctrine and remains consistent with how other courts have addressed this situation.**[3]**

Defendants disagree. But they cite only cases that fit at least one of the two scenarios discussed above. Take *Humphrey*. There, "defendants moved to dismiss Humphrey's tort claim for lack of subject matter jurisdiction . . . on the grounds that the complaint was not timely filed under the FTCA's statute of limitations." *Humphrey*, 279 F. App'x at 330. Humphrey did not file a response to defendants' motion and the district court found for defendants. *Id.* On appeal, Humphrey argued that "the district court erred when it considered documents beyond the pleadings on defendants' motion to dismiss for lack of subject matter jurisdiction, without allowing further discovery during the motions' pendency." *Id.* at 331. We found that argument forfeited. *Id.* When the government explained why there was a statute-of-limitations issue in its motion to dismiss, Humphrey had to respond with any reasons why it shouldn't apply. *See id.* at

---

**[3]**Also consider that we've said that "a district court abuse[s] its discretion in dismissing a plaintiff's claims solely because the plaintiff failed to respond to the defendant's motion to dismiss for failure to state a claim." *Bangura v. Hansen*, 434 F.3d 487, 497 (6th Cir. 2006) (citing *Carver v. Bunch*, 946 F.2d 451, 452 (6th Cir. 1991)).

331–32; *see also In re Hood*, 319 F.3d at 758, 760 (similar holding in the context of sovereign immunity); *Scott v. Tennessee*, 878 F.2d 382 (6th Cir. 1989) (sovereign immunity); *Allstate Ins. Co. v. Global Med. Billing, Inc.*, 520 F. App'x 409, 411–12 (6th Cir. 2013) (standing); *Resnick v. Patton*, 258 F. App'x 789, 790–91, 793 n.1 (6th Cir. 2007) (mootness).  These are all scenario-one cases where plaintiffs had to bring each of their responses to jurisdictional challenges below if they wanted to raise those responses on appeal.

The other cases that Defendants cite fall within scenario two: A plaintiff filed a response to a defendant's motion to dismiss but only included some of its arguments.  On appeal, the plaintiff wanted us to consider a new argument.  There too we have found that the plaintiff forfeited that argument.  *See Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 422–23, 430 (6th Cir. 2016); *Top Flight Ent., Ltd. v. Schuette*, 729 F.3d 623, 629–30, 33 (6th Cir. 2013); *KSA Enter., Inc. v. Branch Banking & Tr. Co.*, 761 F. App'x 456, 463 (6th Cir. 2019); *see also Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 577–78 (6th Cir. 2002) (finding arguments "not properly before this Court" both because the plaintiff failed to raise them before the district court and only raised them on appeal in his reply brief).[4]

That brings us to the second procedural argument.  State Defendants argue that they weren't properly served.  But they forfeited this argument because they didn't seek dismissal pursuant to 12(b)(5); nor did they properly develop an argument for improper service in their 12(b)(6) motion.  *See Corridore v. Washington*, 71 F.4th 491, 500 (6th Cir. 2023) (noting that a one-sentence argument doesn't sufficiently preserve an argument for appeal).  Federal Rule of Civil Procedure 12(h) states that, in these circumstances, the defense of insufficient service of process is waived.  *See Am. Ass'n of Naturopathic Physicians v. Hayhurst*, 227 F.3d 1104, 1106 (9th Cir. 2000), *as amended on denial of reh'g* (Nov. 1, 2000); *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 701 (6th Cir. 1978).

---

[4]*Haines* and *Top Flight* could also be characterized as scenario-one cases.

**IV.**

Moving to the merits, Heyward argues that the district court shouldn't have dismissed his (1) RLUIPA claim, (2) First Amendment retaliation claim, and (3) Equal Protection Clause claim. We address each in turn.

**A.**

To start, Heyward cannot bring his RLUIPA claim. RLUIPA doesn't permit money-damages claims against state prison officials in their individual capacities. *Haight v. Thompson*, 763 F.3d 554, 568–70 (6th Cir. 2014); *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 460 (6th Cir. 2019). And his requests for injunctive relief under RLUIPA are moot for at least two reasons. First, he didn't allege a present or future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983). Instead, his alleged injuries occurred from "approximately May 17th, 2018" to "June 17th, 2018, [during] the Holiest observance for all Muslims globally, called Ramadan." ECF No. 1, PageID 4 (emphasis omitted). "Without a time machine, we cannot go back" and fix alleged wrongs during Ramadan in 2018. *Thompson v. DeWine*, 7 F.4th 521, 524 (6th Cir. 2021). Second, his RLUIPA claim is moot because Heyward has transferred facilities, and his "requests were directed specifically at" AOCI's officials "and were not targeted at" the Ohio Department of Rehabilitation and Correction ("ODRC") "program[s] as a whole." *Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010) (citing *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996)); *see* Appellant Br. at 1; ECF No. 24-1, PageID 291.

**B.**

Next we consider his First Amendment retaliation claim. As above, any declaratory or injunctive relief that Heyward seeks is mooted by his transfer to a different prison facility. *See Colvin*, 605 F.3d at 289. We therefore consider only whether Heyward is entitled to monetary damages for any alleged violation of his constitutional rights under § 1983.

To plead a First Amendment retaliation claim, Heyward must allege facts that support the following: (1) he "engaged in protected conduct," (2) "an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct," and (3) "there is a causal connection between elements one and two—that is, the adverse action was

motivated at least in part by [his] protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). "Protected conduct" here would be anything protected by the First Amendment, including that an "inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf." *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). For element two, "the issue is whether a person of ordinary firmness would be deterred, not whether [the plaintiff] himself actually was deterred" by the adverse action. *Thomas v. Eby*, 481 F.3d 434, 441 (6th Cir. 2007). And "[e]ven the threat of an adverse action can satisfy this element." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010). "The plaintiff's evidentiary burden is merely to establish the factual basis for his claim that the retaliatory acts amounted to more than a de minimis injury." *Id.* at 473 (quoting *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002)). Element three looks at the defendant's subjective motivation for taking the alleged adverse action. *Id.* at 475.

Heyward alleges that state officials improperly retaliated against him three times. The first incident occurred after Heyward filed grievances about alleged discriminatory treatment during Ramadan—specifically the insufficient amount of calories he and others received. So "to intimidate ('chill') Plaintiff Heyward into not making any more complaints, he was threatened, by Defendant Foster[,] to be transferred out of AOCI to a higher security prison, with a trumped-up bad Conduct Report." ECF No. 1, PageID 6. And he alleged that he would be "subject to receiving additional prison time . . . from the Parole Board . . . for any Conduct Report received." *Id.*

Heyward's claim falters at element three because his allegations that Defendant Foster's threats were motivated at least in part by Heyward's Ramadan-related grievances are conclusory. Heyward alleges that the transfer threat was because of his grievances, but he doesn't allege any facts to support that. And he did not allege anything about Defendant Foster's subjective motivations, which he must do. So this incident doesn't establish a retaliation claim. *See Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019); *Cantley v. Armstrong*, 391 F. App'x 505, 506–07 (6th Cir. 2010).

The second incident involved alleged false drug tests. "Heyward alleges that he was subject to a retaliatory false drug test once officers learned that he was assisting other prisoners

in their grievance process which resulted in disciplinary proceedings that may have affected his parole." Appellant Br. at 20 (citing ECF No. 1, PageID 11). In short, on January 23, 2019, he and his "entire cell block" underwent drug tests. ECF No. 1, PageID 9. He alleges that false positives were assigned to prisoners at random, including him. Defendant Szabados allegedly assigned a random cup to Heyward and told Heyward that he tested positive for marijuana. An unknown officer purportedly said: "We'll break you yet Heyward!!" and Szabados laughed. *Id.* at PageID 10. Heyward "then filed complaints not only for himself but also assisted sixteen (16) other [p]risoners in doing the same." *Id.* He claims that AOCI granted all seventeen grievances, but rather than dropping the issue, "Defendants Szabados, Ladesma, and Factor, upon learning that . . . Heyward . . . wrote all the [g]rievances on the matter, conspired together, and . . . imposed a conspiratorially planned and executed disciplinary action upon Heyward (and all other Prisoners caught up in the 1-23-19 testing)." *Id.* at PageID 11.

Heyward's allegations fail to make out a retaliation claim. To start, Heyward alleges two adverse actions—the false drug test and the later disciplinary action. As to the false drug test, Heyward alleges that certain officers acted against him in response to his filing of grievances on others' behalf. But Heyward didn't properly allege that the filing of grievances on behalf of other prisoners is protected conduct. Recall that an "inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf." *Herron*, 203 F.3d at 415. But an inmate does not generally have an independent right to help other prisoners with their grievances. *Id.* He does only if "the inmate receiving the assistance would otherwise be unable to pursue legal redress." *Id.* To make out this derivative claim, we've said that a plaintiff in Heyward's shoes must allege that his help was necessary for the aggrieved inmate to pursue his legal rights. *See Hermansen v. Ky. Dept. of Corr.*, 556 F. App'x 476, 477 (6th Cir. 2014). And here, Heyward didn't do that. When a retaliation claim on another's behalf is otherwise meritorious, we sometimes remand to allow the inmate to amend his complaint. *See Herron*, 203 F.3d at 416–17. But here it isn't otherwise meritorious.

To see why, let's jump to the third element and ask: Did Heyward allege that Szabados's conduct was motivated at least in part by Heyward's grievance-filing?**5** We don't think so. For one, it's not clear that Szabados was a decisionmaker here. Heyward doesn't allege that Szabados ordered the drug tests, just that Szabados administered the drug test. *See Smith v. Campbell*, 250 F.3d 1032, 1035, 1038 (6th Cir. 2001) (finding no causal connection where prison official made comments about inmate's potential prison transfer but was not involved in decision to transfer inmate). Regardless, the only allegation from which we could infer a retaliatory motive is Szabados's laugh in response to an unknown officer saying "we'll break you yet Heyward!" But Heyward didn't plausibly allege that this ambiguous laugh was somehow nefarious. To the contrary, on Heyward's account, after Heyward received his test results, Szabados sounded sympathetic, saying "I don't know what happened" and "I'm surprised as well." ECF No. 1, PageID 10.

Moreover, Heyward's allegation that "Defendants Szabados, Ladesma, and Factor . . . conspired together . . . and executed disciplinary action upon Heyward (and all other Prisoners caught up in the [] testing)" is even more specious. *Id.* at PageID 11. For the reasons just mentioned, Heyward can't maintain a claim against Defendant Szabados, and he did not allege anything about Defendants Ladesma and Factor's subjective motivations here, so this incident doesn't establish a retaliation claim. *See Boxill*, 935 F.3d at 518; *Cantley*, 391 F. App'x at 506–07.

Finally, we consider incident three. Heyward alleges that he filed a grievance against Defendant Guise, who then retaliated against him. As the former Vice President of the AOCI Cultural Awareness Inmate Group (CAA), Heyward brought a theft problem to the attention of the President of CAA (a fellow inmate). "While making his complaint known to the CAA President, Defendant Guise abruptly began yelling directly at Heyward at the top of her lungs . . . 'Why is it always you!!?? Why is it always you!!?? I'm sick of your complaining!!!'" ECF No. 1, PageID 9 (emphasis omitted). Heyward alleges that she was referring to his other grievances "for what appeared to be the undue obstruction of various attempts of the CAA to show movies

---

**5**Defendant Szabados appears to be the only officer possibly implicated here. An unknown officer makes an off-color comment, and we don't have information about any of the other officers' subjective intent.

and other fundraising activities." *Id.* He then filed a grievance against Guise. And in retaliation, Guise "threatened members in the [CAA] . . . to kick Heyward out of the [CAA] or else the organization would be shut down." Appellant Br. at 20–21 (citing ECF No. 1, PageID 9).

We've established that a grievance Heyward filed on his own behalf is protected conduct, *see Herron*, 203 F.3d at 415, so we then ask whether Heyward suffered an adverse action. He did. Heyward alleges the denial of a privilege—membership in the CAA. We have held that actions resulting "in more restrictions and fewer privileges for prisoners are considered adverse." *Hill*, 630 F.3d at 474. "[T]he deprivation of privileges is hardly 'inconsequential'—indeed, they are all that prisoners really have." *Maben v. Thelen*, 887 F.3d 252, 267 (6th Cir. 2018). And we've found that the loss of similar privileges "cannot be resolved as a matter of law." *See id.* at 266–67 (finding that the "loss of privileges for seven days . . . includ[ing] the rights to access exercise facilities, to attend group meetings . . . and to access the activity room" "cannot be resolved as a matter of law"); *LaFountain v. Harry*, 716 F.3d 944, 948 (6th Cir. 2013) (finding that a prisoner sufficiently alleged that damage to a typewriter was an adverse action). So Heyward plausibly alleges that loss of his CAA membership would deter a person of ordinary firmness from exercising his First Amendment rights.

Next, Heyward plausibly alleges that Defendant Guise's action was motivated at least in part by Heyward's grievance-filing. Defendant Guise expressed frustration about the number of complaints Heyward was filing with respect to the CAA. After Heyward filed a grievance about this altercation, Guise issued the threat to the CAA members. Because Heyward's allegations are at least plausible, Heyward adequately pleaded a First Amendment retaliation claim against Defendant Guise. *See Hill*, 630 F.3d at 476.

State Defendants argue that there's a lack of causation. Although "defendants are not responsible for adverse actions that they do not cause, they are responsible for those consequences that inextricably follow from their alleged retaliatory conduct." *LaFountain*, 716 F.3d at 949 (quoting *Siggers-El v. Barlow*, 412 F.3d 693, 702 (6th Cir. 2005)) (cleaned up). Heyward alleges that Defendant Guise "threatened members in the [CAA] . . . to kick Heyward out of the organization or else the organization would be shut down." Appellant Br. at 20–21(citing ECF No. 1, PageID 9). Consider the proposition. Either (1) they vote Heyward out,

thereby denying him this privilege; or (2) they all lose the privilege. So Heyward sufficiently pleaded that the group's action to vote him out was "a foreseeable consequence." *LaFountain*, 716 F.3d at 949.

State Defendants also argue that Heyward's continued filing of grievances proves that this threat did not deter him from exercising his constitutional rights. But this argument is flawed because "the issue is whether a person of ordinary firmness would be deterred, not whether [Heyward] himself actually was deterred." *Thomas*, 481 F.3d at 441.

In sum, we find that Heyward adequately pleaded a retaliation claim against Defendant Guise.

## C.

We now turn to Heyward's equal-protection claim. The Fourteenth Amendment Equal Protection Clause provides that states may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The threshold element of an equal protection claim is disparate treatment." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). Discriminatory intent or purpose is also required, but "an invidious purpose may be inferred" where a classification "impinge[s] upon the exercise of a fundamental right." *Koger v. Mohr*, 964 F.3d 532, 544–45 (6th Cir. 2020) (quoting *Maye v. Klee*, 915 F.3d 1076, 1085–86 (6th Cir. 2019)). More on that later.

So first we must ask: did Heyward allege that certain defendants treated Muslims differently compared to similarly situated adherents of other faiths? And under *Koger* and *Maye*, if Heyward alleged a facially discriminatory distinction between Islam and Christianity or Judaism, he wouldn't need to allege invidious purpose.

Recall the allegations in his complaint: Defendants Cooper, Smith, Engles, Al-Hagg, Davis, and Factor treated members of other faith traditions differently than they treated Muslims. Heyward recounts three particular denials. First, his food requests during Ramadan were refused. He alleged that food prepared during Ramadan "is to be both prepared and served by Muslims only." ECF. No 1, PageID 4. "Defendants Cooper, Smith, Engles, Al-Hagg, and

Factor" allowed non-Muslim faith traditions to receive food prepared in the way their religion requires. *Id.* For example, he alleges that Christians had access to properly prepared communion, and members of the Jewish faith received Kosher food.

Second, while Christians receive the elements of communion, and members of the Jewish faith receive special meals on Rosh Hashanah and Yom Kippur, Defendants did not accommodate his request to break his fast daily with dates.

Third, Defendants Cooper, Smith, Engles, Al-Hagg, Davis, and Factor allowed other religious groups to gather congregationally to celebrate various events but did not allow Muslims to do so during Ramadan. "And the Ramadan fast [must] be broken congregationally . . . each and every day" with dates and water, and a shared meal. *Id.* at PageID 5. He alleges that Christians can congregate for Communion or Kairos (a retreat), but his requests to gather congregationally during Ramadan were denied.

Defendants argue that Heyward didn't allege with enough particularity that these six Defendants were in positions to grant or deny religious accommodations. This argument matters for two reasons. First, Heyward must allege facts that suggest that these Defendants granted religious accommodations to other faiths in order for him to be similarly situated to members of other religions. *See, e.g.*, *LaFountain*, 716 F.3d at 950. And second, our "Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right." *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 564 (6th Cir. 2011) (quoting *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008)).

Four of the six Defendants pass this test. First, we can infer from the facts of the complaint and their positions of authority that Defendants Cooper, Smith, Davis, and Factor participated in or oversaw the provision of religious foods and activities across all religions. Heyward alleges that Cooper is the Food Service Director at AOCI and is "responsible for overseeing and managing food service operations at AOCI, including scheduling, inventorying, ordering, hiring, and delegating orders to Aramark staff and Prisoners, and development and coaching/training of Aramark staff and Prisoners." ECF No. 1, PageID 3–4. Smith is the AOCI

Deputy Warden of Special Services. *Id.* at PageID 2. As the Religious Services Administrator, Davis oversees "all of the ODRC's prisons, during all times relevant to this Complaint." *Id.* And as the AOCI Deputy Warden of Administration, Factor was the "designee for direct appeals of Rules Infraction Board (RIB) decisions during all times relevant to this Complaint." *Id.* at PageID 3. We agree with Defendants that it doesn't seem plausible that Engles (the AOCI Chaplain) and Al-Hagg (the prison's Imaam) were providing services to inmates who were not members of their own faiths. In this context, they were likely only granting (Engles) or denying (Al-Hagg) inmates' accommodation requests, but it is not likely that they were in a position to treat different faith groups dissimilarly.

Next, we find that Heyward sufficiently pleaded facts alleging that Cooper, Smith, Davis, and Factor limited his religious practice. The facts alleged in the complaint are "sufficient to plausibly suggest that" they knew about Heyward's Ramadan complaints and "failed to act." *Shively v. Green Loc. Sch. Dist. Bd. of Educ.*, 579 F. App'x 348, 353 (6th Cir. 2014). To start, Cooper, Smith, Davis, and Factor were allegedly "directly responsible for and directly involved in the planning, implementation, and supervision of the Ramadan observance." ECF. No 1, PageID 4 (emphasis omitted). Heyward further alleged that the Defendants "[k]nowingly and systematically block[ed] and den[ied] [his] nearly every mandatory tenet as it involve[d] the preparation, facilitation and implementation of Ramadan" by denying him food prepared by Muslims, disallowing breaking of the daily fast in a congregation of Muslims with dates and water, and not ensuring that Heyward received proper nutrition during the month of fasting. ECF. No 1, PageID 4–6. This makes sense given that Cooper is the Food Service Director at AOCI, Smith is the AOCI Deputy Warden of Special Services, Davis is the ODRC Religious Services Administrator, and Factor is the AOCI Deputy Warden of Administration. Next, Heyward alleges that he "continuously" complained to Cooper, Smith, and Factor "both verbally and in writing" about the involvement of non-Muslims in preparing and serving food during Ramadan, and "repeatedly complained, both verbally and in writing" to Cooper, Smith, Davis, and Factor about portion sizes. *Id.* at PageID 4, 6. From all this, we can plausibly infer that

"they would likely have known" about Heyward's complaints over dates and limits on congregational gathering too. *Shively*, 579 F. App'x at 353.**⁶**

Given "the number and variety of ways" that Heyward spoke up and filed formal grievances, the complaint plausibly alleges that Cooper, Smith, Davis, and Factor knew about how Heyward was limited in his Ramadan observance, and "given their positions of authority, were involved in making decisions regarding how it would be addressed." *Id.* at 354. We thus find that Heyward alleges disparate treatment as compared to similarly situated individuals against Defendants Cooper, Smith, Davis, and Factor.

Finding that Heyward alleges disparate treatment, we now ask whether he plausibly alleges that his religious exercise was burdened such that an invidious purpose may be inferred. *See Maye*, 915 F.3d at 1085; U.S. Const. amend. I.**⁷** Because Heyward alleges facially discriminatory distinctions in treatment between members of different faiths, this case falls under *Koger* and *Maye*. As mentioned, our court explained in these two cases that "we treat as presumptively invidious those classifications that . . . impinge upon the exercise of a fundamental right," such as "speech or religious freedom." *Maye*, 915 F.3d at 1085–86 (internal quotation marks omitted); *Koger*, 964 F.3d at 544 (quoting same language). In other words, allegations of "a facially discriminatory distinction" between different religious groups allege a burden on the "fundamental right[] to religious freedom under the First Amendment, which means an invidious purpose may be inferred." *Maye*, 915 F.3d at 1086; *Koger*, 964 F.3d at 545 (same). So when a plaintiff presents allegations of facially discriminatory distinctions, as Heyward does here, the plaintiff has sufficiently alleged an equal-protection violation. Under

---

**⁶**State Defendants note that the dates were allegedly obtained by prison officials before Ramadan but were stolen or consumed by other inmates and argue that is not their fault. True, but Heyward's complaint plausibly alleges the problem is that certain Defendants failed to remedy the situation by providing other dates, even after the dates were allegedly stolen.

**⁷**On appeal, Heyward did not maintain a freestanding free-exercise claim because he referenced it only in a footnote. *See Dairy Farmers*, 426 F.3d at 856. So here, only his equal-protection claim is properly before us. As a result, we need not go through the analysis in *Turner v. Safley*, 482 U.S. 78, 89–90 (1987), which applies to free-exercise claims, *Maye*, 915 F.3d at 1083. Instead, we jump to Heyward's equal-protection claim.

Though the claims are similar in this context, the Free Exercise and Equal Protection Clauses guard different interests. The former shields inmates from unlawful religious restrictions that run afoul of the First Amendment and *Turner*, while the latter protects against lawful religious restrictions that are perhaps legal under *Turner* but problematic because they are applied unevenly.

Heyward's pleading, invidious purpose is therefore presumed.[8]  We thus decline to dismiss Heyward's equal-protection claim.  We remand this claim for proceedings consistent with this analysis.

**V.**

For these reasons, we AFFIRM the district court's dismissal of Heyward's RLUIPA claim, REVERSE the district court's dismissal of Heyward's First Amendment retaliation claim against Defendant Guise, and REVERSE the district court's dismissal of Heyward's Equal Protection Clause claim against Defendants Cooper, Smith, Davis, and Factor.  We REMAND for proceedings consistent with this opinion.

---

[8]Our holding extends only to whether Heyward has sufficiently pleaded an equal-protection violation, not whether there was in fact an equal-protection violation.  We leave that determination for the district court on remand.

---

**CONCURRENCE / DISSENT**

---

RONALD LEE GILMAN, Circuit Judge, concurring in part and dissenting in part. I fully concur in the portions of the majority opinion regarding Heyward's RLUIPA and Equal Protection Clause claims. As for the First Amendment retaliation claims, I agree with the majority that Heyward has adequately pled a retaliation claim against Defendant Guise based on her efforts to have other CAA members expel him from the organization. (This being Heyward's third retaliation claim.) I believe, however, that the first two such claims—based on Defendant Foster's transfer threats and Defendant Ladesma's post-drug-test actions—are also sufficient to establish retaliation claims against Defendants Foster and Ladesma, respectively. I therefore dissent from the portion of the majority opinion affirming the dismissal of Heyward's First Amendment retaliation claims against these two defendants.

**I. DEFENDANT FOSTER**

Regarding the first alleged incident of retaliation, I disagree with the majority's conclusion that Heyward "doesn't allege any facts to support" his allegation that Defendant Foster's threat was because of the Ramadan-related grievances and "did not allege anything about Defendant Foster's subjective motivations[.]" Maj. Op. at 10. The majority acknowledges Heyward's allegation that, "to intimidate ('chill') Plaintiff Heyward into not making any more complaints, he was threatened, by Defendant Foster[,] to be transferred out of AOCI to a higher security prison, with a trumped-up bad Conduct Report." *Id*. But that is only part of the sentence describing the incident, which states in its entirety as follows:

> Even in the face of the photographic record Plaintiff[] kept (of each and every Ramadan food tray), and showed them to the Defendant[s], they remained deliberately indifferent, and even became hostile (i.e. on one occasion, out of several, in an attempt to intimidate ("chill") Plaintiff Heyward into not making any more complaints, he was threatened, by Defendant Foster, to be transferred out of AOCI to a higher security prison, with a trumped-up bad Conduct Report, in retaliation of his verbal and written complaints about how fantastically terrible the Ramadan food trays were, and literally showing the photographic record of it.[)]

Compl., ECF No. 1, PageID 6. Heyward has therefore expressly alleged that Defendant Foster's threats were one example—his exact words are "i.e., on one occasion, out of several"—of how the Defendants "became hostile" to Heyward "in the face of" the photographs that he kept of the Ramadan food trays and showed to the Defendants. *Id.*

"Pro se complaints are to be held 'to less stringent standards than formal pleadings drafted by lawyers,' and should therefore be liberally construed." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (citing *Martin v. Overton*, 391 F.3d 710, 712 (6th Cir. 2004)). Construing Heyward's pro se complaint liberally, I believe that these facts are sufficient to support his allegation that Defendant Foster's threats were because of Heyward's Ramadan-related grievances. The majority's conclusion that Heyward "did not allege anything about Defendant Foster's subjective motivations," Maj. Op. at 10, similarly overlooks parts of the complaint. As Heyward expressly alleges, "he was threatened, by Defendant Foster[,] . . . *in retaliation of* his verbal and written complaints about how fantastically terrible the Ramadan food trays were[.]" Compl., ECF No. 1, PageID 6 (emphasis added).

The facts of this case are therefore materially different from the two cases relied on by the majority: *Boxill v. O'Grady*, 935 F.3d 510 (6th Cir. 2019), and *Cantley v. Armstrong*, 391 F. App'x 505 (6th Cir. 2010). Unlike the plaintiff in *Boxill*, who "offered no plausible, non-conclusory facts to show that [the defendant] was even aware of her complaints against him," 935 F.3d at 518, Heyward alleged that Defendant Foster's threats were in direct response to his grievances and photos of the Ramadan food trays. Similarly, whereas the plaintiff in *Cantley* "alleged no facts whatsoever from which the district court could even infer that [one of the defendants] was in any way involved in the decision to transfer him[,]" 391 F. App'x at 507, Heyward expressly alleges that Defendant Foster was the individual who made those threats.

Accepting all of Heyward's allegations as true, I do not believe that "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *See Herron v. Harrison*, 203 F.3d 410, 414 (6th Cir. 2000) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). I would therefore hold that Heyward has alleged sufficient facts to support his First Amendment retaliation claim against Defendant Foster.

## II.  DEFENDANT LADESMA

As for the second alleged incident of retaliation, the majority recognizes that "Heyward alleges two adverse actions—the false drug test and the later disciplinary action," Maj. Op. at 11, but focuses only on the drug test in its analysis.  I agree with the majority that Heyward's First Amendment retaliation claims against Defendants Szabados and Factor are insufficient.  His only allegation against Defendant Szabados regarding the post-drug-test punishment was that Defendant Szabados "conspired together . . . and executed disciplinary action upon Heyward" along with Defendants Ladesma and Factor.  Compl., ECF No. 1, PageID 11.  Without any facts about what Defendant Szabados did in allegedly conspiring with the others, this statement is too conclusory to establish the adverse action that Defendant Szabados purportedly took against Heyward.  *See Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007) (citing *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005)) ("Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.").

The allegation that Defendant Factor ordered another defendant to "[m]ove forward on all Conduct Reports," Compl., ECF No. 1, PageID 11, is less conclusory, but in the absence of any other allegations about Defendant Factor's involvement, this statement alone is not sufficient to show that Defendant Factor "was motivated at least in part by [Heyward]'s protected conduct." *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  Heyward's retaliation claim against Defendant Factor thus suffers the same fate as his claim against Defendant Szabados.

I cannot agree, however, that Heyward failed to allege a First Amendment retaliation claim against Defendant Ladesma.  The majority recognizes that a grievance filed on a prisoner's own behalf is protected conduct, Maj. Op. at 11 & 13, and Heyward filed grievances about the drug tests for both himself and 16 other prisoners after being subjected to the allegedly false tests.  Compl., ECF No. 1, PageID 10.  The grievance that Heyward filed for himself is therefore sufficient to constitute protected conduct without regard to the status of the other 16 grievances.

And even though all 17 of Heyward's grievances were granted and "any and all possible Disciplinary Action was supposed to be completely cancelled (i.e. 'thrown out')" as a result,

Defendant Ladesma nevertheless found Heyward and the other prisoners guilty and "impos[ed] all punishments/adverse actions . . . simultaneously." *Id.* at PageID 11. Heyward alleged that the punishments included "but [are] not limited to placement in the Restrictive Housing Unit (i.e. 'The Hole[,]' which always results in a massive loss of personal property); cell isolation, commissary restriction, phone restriction," and more. *Id.* at PageID 10. "[B]ecause actions that result in more restrictions and fewer privileges for prisoners are considered adverse," *see Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010) (citation omitted), Heyward has sufficiently alleged that Defendant Ladesma took an adverse action against him.

Finally, Defendant Ladesma's threats that he would "find you all guilty no matter what" and that "there's no way I'm going to let any of you off on a technicality" support an inference that Heyward's meritorious grievances—which Defendant Ladesma considered "a technicality"—motivated Defendant Ladesma to find Heyward and the other prisoners "guilty" based on the positive drug tests and to punish them accordingly. *See Hill*, 630 F.3d at 472 (holding that the defendants' statements that they "didn't need the paper-work up here" and "would do the investigative report 'personally' to ensure that [the plaintiff] would be [transferred]" supported an inference of retaliatory motive). Heyward has therefore sufficiently alleged facts to satisfy all three elements of a First Amendment retaliation claim against Defendant Ladesma.

### III. CONCLUSION

In sum, I would allow Heyward's First Amendment retaliation claims against Defendants Foster and Ladesma to proceed. I therefore respectfully dissent from this part of the majority opinion.